## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RAJEEYAH WHITNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 C 2166 |
| | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD | ) | |
| CORPORATION d/b/a METRA, | ) | |
| METRA CONDUCTOR JAMAL PORSHE, | ) | |
| METRA POLICE OFFICER LAURIE | ) | |
| SABATINE, METRA POLICE OFFICER | ) | |
| O'NEAL, | ) | |
| Defendants. | ) | |

### MEMORANDUM ORDER AND OPINION

Just after midnight on September 5, 2013, two Metra police officers—Defendants Laurie Sabatini and Michael O'Neill—removed Plaintiff Rajeeyah Whitney from a northbound Metra train at the Kensington/115th Street Metra Station. Ultimately, the officers arrested Ms. Whitney, and Officer Sabatini filed a misdemeanor battery complaint against Ms. Whitney. That charge was later dismissed. Ms. Whitney retained counsel and in 2015 filed a complaint pursuant to 42 U.S.C. § 1983 against the officers, the Northeast Illinois Regional Commuter Railroad Corporation ("Metra"), and Jamal Porche, a Metra train conductor who has since been dismissed from this case.[1] Now proceeding *pro se*, Plaintiff Whitney alleges that Defendants violated her Fourth Amendment rights; she also asserts several Illinois state law claims. As explained below, Defendants' motion for summary judgment [129] is granted in part and denied in part, and the parties are directSd to submit supplemental briefs on the issue of qualified immunity.

---

[1] Mr. Porche was dismissed from this case in December 2015 by Judge Darrah, to whom the case was initially assigned. *Whitney v. Ne. Illinois Reg'l Commuter R.R. Corp.*, No. 15-C-2166, 2015 WL 6594315 (N.D. Ill. Oct. 28, 2015).

## **BACKGROUND**

At around midday on September 4, 2013, Rajeeyah Whitney took the southbound Metra train from the 57th St. Station to the Ivanhoe Station on her way to work. (Whitney Deposition ("Whitney Dep."), Ex. F to Defs.' Statement of Material Facts (hereinafter "Dfs.' SMF") [129-2 Ex. F] at 25:7–18.) This was the first time she had taken this train route. When she finished work at around 10:30 p.m., Ms. Whitney returned to the Ivanhoe Station, intending to take the northbound train back home. (*Id.* at 26:4–27:2.) Instead, at around 11:00 p.m., Ms. Whitney mistakenly boarded southbound Metra Train No. 149. At some point shortly thereafter, Metra train conductor Jamal Porche "informed her that . . . she could get off at the next stop to board a northbound train." (Dfs.' SMF [129-2], at ¶ 7.) Ms. Whitney claims that Mr. Porche also told her that another train would be "coming by in a few minutes." (Compl. [20], at ¶ 8.) She exited the train at the next stop—Sibley Boulevard and 147th Street—and waited on the platform for approximately one hour.

The next northbound train, which arrived at 12:03 a.m., turned out to be the same train that Ms. Whitney had exited earlier; having reached the end of its route, the train reversed direction and began traveling north as northbound Train No. 150. (Dfs.' SMF [129-2], at 9–11.) Thus, when she boarded, Ms. Whitney again encountered Mr. Porche. Ms. Whitney claims that when Mr. Porche came to collect her fare, she asked him about her long wait time: She recalls telling him, "I said you mentioned that the train . . . would arrive in a few minutes. I sat there for over 40 minutes." (Whitney Dep. [129-2 Ex. F], at 36:12–14.) She testified at her deposition that Porche responded, "Well, if you knew how to read." (Id. at 37:19.) Offended, Ms. Whitney "proceeded to look on the train to see if there was a sign for customer care or customer relations." (*Id.* at 39:5–7.) She testified that she eventually followed Mr. Porche into the vestibule of the train car, asked him for his name, and confronted him about his comment. (*Id.* at 42:11–51:9.) Defendants, on the other hand, claim that Ms. Whitney demanded the customer service telephone number immediately upon boarding the northbound train and persisted with the request even after she was seated. (Affidavit of Jamal Porche [129-2 Ex. B], at ¶ 12.) Mr. Porche asserts that he provided her with "a copy of the train schedule brochure with the customer service number and

train schedule details" and "returned to the vestibule area of the train." (*Id.* at ¶14.) Mr. Porche recalls, further, that Ms. Whitney "began raising her voice and using profanity" and eventually joined him in the vestibule area, "tak[ing] steps toward" him and "making derogatory statements." (*Id.* at ¶¶ 15–16.)

When the northbound train arrived at the Kensington/115th Street Station, Defendant Officers Sabatini and O'Neill boarded the train. Ms. Whitney believes that Mr. Porche had summoned them, but the only evidence she offers is that Mr. Porche was holding a cellphone in his hand while standing in the train vestibule. (Whitney Dep. [129 Ex. F], at 62:16–18.) For their part, Defendants assert that the officers boarded "in the normal course of patrol," but provide no information about what that "normal course" is. (Affidavit of Jamal Porche [129-2 Ex. B], at ¶ 18; Affidavit of Laurie Sabatini [129-2 Ex. C], at ¶ 5.) Officers Sabatini and O'Neill encountered Ms. Whitney and Mr. Porche in the vestibule of the train car. (Video [129-2 Ex. A].) A silent video recording from a camera on the platform captures part of the subsequent events. The video recording lasts for almost three minutes; the camera angle permits the viewer to see the train platform and just inside the train's open door, but does not provide a view further into the train car.

The video shows the train car opening as the train pulled into the station and stopped. Mr. Porche can be seen stepping into the doorway of the vestibule, positioning himself in the open door of the car, leaning against the door opening and facing inside the vestibule with his back to the camera. Ms. Whitney is standing inside the vestibule, talking to Mr. Porche in full view of the camera. Both officers enter the train's vestibule, but Officer O'Neill exits thirteen seconds later and remains on the platform for most of the remainder of the video. Officer Sabatini stays inside the train car, out of sight of the camera. Ms. Whitney continues to appear to verbally engage Mr. Porche and to address both officers; though there is no audio component to the recording, the video shows that Mr. Porche and Officer O'Neill were verbally responding. Officer O'Neill points several times into the train car, and Ms. Whitney disappears into the train. Eventually she re-

emerges, pulled from the train by Officer Sabatini's grip on the strap of her shoulder bag. As soon as they exit, the train's doors close and the train leaves the station. Ms. Whitney remains on the train platform with the two officers.

The parties disagree about what happened inside the train off-camera. Ms. Whitney testified at her deposition that she was happy to see the officers, as she hoped they would "provide [her] with information as to how to contact the [Metra] supervising office and/or to bring calm to the situation." (Whitney Dep. [129-2 Ex. F], at 58:16, 60:7–9.) As she tried to explain to the officers what had transpired between herself and Mr. Porche, she testified, Officer Sabatini instructed her to have a seat "[i]n a very angry tone, very loud tone." (*Id.* at 59:24–60:0, 67:9.) Ms. Whitney claims that she was in the process of obeying while also "trying to ask [Officer Sabatini] about a phone number or way" to file a complaint about Mr. Porche. (*Id.* at 65:23–66:23.) As she was taking a seat, Ms. Whitney claims that Officer Sabatini "grabbed" her by her shirt, and she "followed" Officer Sabatini off the train. (*Id.* at 64:24–65:1.) Ms. Whitney also testified that she "had a purse on and [Officer Sabatini] pulled" her off the train. (*Id.* at 71:3–4, 72:13.) The video footage confirms this. (Video [129-2] Ex. A].) "I don't know why she grabbed me," Ms. Whitney testified. (Whitney Dep. [129-2 Ex. F.], at 70:22.)

Defendant Sabatini recalls things differently. She asserts in her affidavit that upon entering the train car's vestibule, she overheard Ms. Whitney, who was also standing in the vestibule, ignore Mr. Porche's instruction to sit down. She claims that Ms. Whitney "became loud and disruptive." (Affidavit of Officer Sabatini [129-2 Ex. C], at ¶ 7.) Officer Sabatini asked Ms. Whitney to sit in the passenger area of the train, and though Ms. Whitney did "relocate[ ] [from the vestibule] to the doorway of the entrance into the passenger seating area," she went no further. (*Id.* at ¶ 8.) From there, Officer Sabatini claims that Ms. Whitney "became loud and belligerent, using profanity" towards Officer Sabatini, and still refused to sit down. (*Id.* at ¶ 9.) Accordingly, Officer Sabatini "removed Ms. Whitney from the train." (*Id.*)

As they exit the train, the video shows that Ms. Whitney appears to be speaking to the officers. (Video [129-2 Ex. A].) Officer O'Neill claims that Ms. Whitney was "verbally challenging her removal from the train." (Affidavit of Officer O'Neill [129-2 Ex. D], at ¶ 11). Ms. Whitney explains that she was asking: "Why did you take me off the train? I'm trying to get home to my children." (Whitney Dep. [129-2 Ex. F], at 73:9–13. *See also* at 74:21–22 (explaining that she did not feel safe on the train platform alone with the two officers).) Officer Sabatini then addresses Ms. Whitney, pointing her finger at the Plaintiff. (Whitney Dep. [129-2 Ex. F], at 75:4–6 (testifying that "Officer Laurie Sabatini was using very negative language, very derogatory language," including "expletives. The word motherfucker. The word animal.").) Ms. Whitney becomes visibly upset, pacing slightly, gesticulating and waving her hands as she speaks. She explained her reactions in her deposition: "Q. . . . At what point did you start pointing your finger? A. When she told me to - - I could sit down and shut the fuck up. She said it really loud. . . . And she pointed her hand first. She pointed her finger." (Whitney Dep. [129-2 Ex. F], at 75:17–23). For his part, Officer O'Neill stated in his affidavit that "Ms. Whitney began using threatening language, gestures and motions with her hands and body toward my partner and me." (Affidavit of Officer O'Neill [129-2 Ex. D], at ¶ 12.)

The video shows that Ms. Whitney eventually takes a step away from the officers, but Officer Sabatini steps toward Ms. Whitney, continuing to verbally engage her and pointing her finger at Ms. Whitney. (Video [129-2 Ex. A].) Ms. Whitney responds by pointing her own finger close to Officer Sabatini's face. As she does so, Officer Sabatini swats Ms. Whitney's hand away, Ms. Whitney swats back without making contact, and Officer Sabatini swings her right arm, contacting the left side of Plaintiff Whitney's head with an open palm. (*Id.*) Officer Sabatini characterizes this contact as "an open-hand strike," used as "a stun technique to distract [Ms. Whitney] and begin to effect an arrest." (Affidavit of Officer Sabatini [129-2 Ex. C], at ¶ 13.) Simultaneously, Officer O'Neill grabs Ms. Whitney; the video shows Mr. O'Neill from behind with his arms around Ms. Whitney, and Ms. Whitney's legs leave the ground, just as Officer O'Neill

and Ms. Whitney exit the left side of the video screen. Officer O'Neill explained: "I simultaneously initiated the restraint of the Plaintiff . . . by grabbing her around her shoulders and upper body . . . ; Ms. Whitney attempted to defeat the restraint by twisting her body and kicking her legs toward Officer Sabatini." (Affidavit of Officer O'Neill [129-2 Ex. D], at ¶ 18.) Ms. Whitney, on the other hand, explains that "Officer O'Neill came . . . behind me. And I feel like I was in a choke hold like this (indicating). And he lifted me up off my feet to where I was dangling and I was seeing stars and I could barely breathe." (Whitney Dep. [129-2 Ex. F], at 82:22–83:3.) While Officer O'Neill and Ms. Whitney can no longer be seen on the video, Officer Sabatini, still barely on-screen, is seen removing her handcuffs from her belt, engaging with Ms. Whitney and Officer O'Neill off the left side of the screen. Officer Sabatini goes in and out of the video frame briefly as she appears to handcuff Ms. Whitney and take her purse. Officer Sabatini then also exits the frame.

From the train station, the officers took Ms. Whitney to Metra's Kensington Yard Police Facility. (Affidavit of Officer Sabatini [129-2 Ex. C], at ¶ 15.) As they entered the facility Ms. Whitney claims, Officer Sabatini "was cussing at [her]." (Whitney Dep. [129-2 Ex. F], 93:18–20.) She also claims that Officer Sabatini cut her spiritual prayer beads from her ankle and threw them away. (*Id.* at 95:23, 97:1–2.) From the Metra police facility, Ms. Whitney was transferred to a Chicago Police Department facility on 111th Street. (*Id.* at 126:11–22.) In the day following the incident, Mr. Porche and Officer Sabatini filed misdemeanor complaints against Ms. Whitney for disorderly conduct and battery. (Misdemeanor Compl. [129-2 Ex. H].) Defendants' summary judgment submissions say nothing about the disposition of those charges. Ms. Whitney testified that she believes the criminal case against her was "just dismissed." (Whitney Dep. [129-2 Ex. F], 145:22–146:2.)

Ms. Whitney claims that she suffered "a lot of head pain," throat and back pain, scratches, and emotional pain, following the incident. (Whitney Dep. [129-2 Ex. F], 99:20–100:1.) She went to the emergency room on September 5, 2013 for her injuries. (*Id.* at 100:14–23.) Her x-rays

were negative, and the doctors told her she had "just minor bruising. Soft tissue." (*Id.* at 102:10–22.) Since then, Ms. Whitney testified, she continues to experience some pain in her back (*id.* at 110:6), but she acknowledges a previous history of back pain as well. (*Id.* at 110:14–17 ("Q. Prior to September 5, 2013, when was the last time that you were treated for back pain? A. That probably was a year prior.").) She has also suffered from "bad dreams" and psychological distress since the incident. (*See generally id.* at 117:24–118:17.) She has been to the emergency room "more than once" for her psychological injuries, and she has sought out "massage therapy and spiritual and religious counseling." (*Id.* at 106:6–6, 119:18.)

Plaintiff Whitney retained counsel and filed this action in 2015. Her first four claims allege violations of the Fourth Amendment, pursuant to 42 U.S.C. § 1983. She alleges that the Defendant Officers use excessive force during her arrest; that she was arrested without probable cause; that Mr. Porche and the Defendant Officers conspired to violate her constitutional rights; and that each Defendant Officer failed to prevent the other officer from violating her civil rights. She also alleges three violations of Illinois state law: malicious prosecution, intentional infliction of emotional distress, and battery. Ms. Whitney's attorneys have since withdrawn [40]. Judge Darrah, to whom this case was initially assigned, recruited counsel to represent her [46], but those attorneys withdrew at Ms. Whitney's request [89], and she now proceeds *pro se*.

## DISCUSSION

The court grants a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). It is the movant's burden to cite "to particular parts of materials in the record" that demonstrate a lack of genuine factual dispute. *Id.* at (c)(1). The nonmoving party then bears the burden to demonstrate that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The burden on the nonmovant "is not onerous," *id.*, and the court "construe[s] all facts

and reasonable inferences in favor of the nonmoving party."[2]  *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  *See also Alicea v. Thomas*, 815 F.3d 283, 289–90 (7th Cir. 2016) (construing contested facts in favor of the nonmoving plaintiff in a § 1983 excessive force case).  To defeat the motion, however, the non-moving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" her position.  *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999).

## I.    Fourth Amendment Claims

### A.    Excessive Force

"An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances."  *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017).  "An officer's use of force is analyzed under the Fourth Amendment's objective reasonableness standard."  *Alicea*, 815 F.3d at 288.  Reasonableness should be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 288 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  In examining reasonableness, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted).  Factors to consider include "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Alicea*, 815 F.3d at 288.

Defendants argue that the officers' use of force was reasonable.  They claim that Ms. Whitney was acting aggressively on the platform and that she "took a strike at Officer Sabatini."

---

[2]    When the nonmoving party proceeds *pro se*, as Ms. Whitney does here, the court will "liberally construe" her submissions.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017).  *See also Nichols v. Michigan Cty. Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) (liberally construing a plaintiff's response to a motion for summary judgment).

(Affidavit of Officer O'Neill [129-2 Ex. D], at ¶ 18.)  Officer Sabatini contends that Ms. Whitney's behavior was "escalating[ly] violent," and that she was in "fear of being physically attacked by Ms. Whitney."  (Affidavit of Officer Sabatini [129-2 Ex. C], at ¶ 12.)[3]  Defendants also argue that Ms. Whitney was refusing to comply with an officer's lawful orders, thereby interfering with the Defendant Officers' duties.

The surveillance video and Ms. Whitney's deposition testimony raise genuine disputes of material fact about the relevant circumstances, however.  A reasonable jury could find that a reasonable officer would not have struck Ms. Whitney in the head.  Ms. Whitney was alone and is physically smaller than either of the two Officers.  (*See* Video [129-2 Ex. A]; Whitney Dep. [129-2 Ex. F], at 87:13 ("I'm only 5['], 1["]; approximately 142 in pounds.").)  She made no physical contact with either officer before Ms. Sabatini struck her to initiate the arrest.  There is no suggestion that the officers believed Ms. Whitney was armed.  Finally, Ms. Whitney and the officers were standing on the train platform when the physical contact occurred.  The train platform provided ample opportunity for the officers to move away from Ms. Whitney, allowing her to cool down and de-escalating the situation.[4]  On these facts, Defendant Sabatini's motion for summary judgment is denied.[5]

---

[3]    Officer O'Neill also claims that Ms. Whitney "advanc[ed] upon Officer Sabatini's immediate personal space."  (Affidavit of Officer O'Neill [129-2 Ex. D], at ¶ 16.)  Defendants in fact characterize Ms. Whitney as having committed a "battery upon Officer Sabatini."  (Dfs.' MSG [129-1], at 6.)  As addressed below, however, the battery charges against Ms. Whitney were dropped.  In Illinois, "[a] person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."  720 ILL. COMP. STAT. 5/12-3(a).  There is no evidence that Ms. Whitney made physical contact with or otherwise caused bodily harm to Officer Sabatini.

[4]    As Defendants note, Illinois law does not require a peace officer to "retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest."  720 ILL. COMP. STAT. 5/7-5.  But it is not clear that the officers were, in fact, attempting to arrest Ms. Whitney before Officer Sabatini struck her, or that she resisted arrest before Officer O'Neill put his arms around her.  And, though officers are not required by law to retreat, a jury could find that a reasonable officer would have done so in this case.

[5]    The surveillance video also raises a genuine question of whether Ms. Whitney was provoked; Officer Sabatini pointed her finger at Ms. Whitney as they exited the train, stepped toward Ms. Whitney when Ms. Whitney stepped back, and made the first physical contact.  The

Officer O'Neill's motion is also denied. O'Neill claims that he "restrained the Plaintiff by grabbing around her shoulders and upper body, while Officer Sabatini proceeded to apply the handcuffs; Ms. Whitney attempted to defeat the restraint by twisting her body and kicking her legs." (Affidavit of Officer O'Neill [129-2 Ex. D], at ¶ 19.) Again, Ms. Whitney described things differently. She testified that she felt like she "was in a choke hold" and that Officer O'Neill lifted her up by the neck. (Whitney Dep. [120-2 Ex. F], 82:23–83:3.) All that appears in the video is an image of Ms. Whitney's legs leaving the ground, and a reasonable jury could view it as supporting either party's version of events. Finally, the court notes that neither Defendants' motion for summary judgment, their statement of material facts, nor any other material on the record counters Ms. Whitney's claim that Officer O'Neill used excessive pressure on her back and neck during the arrest. (*Id.* at 89:11–15.) Defendants are not entitled to summary judgment on the excessive force claim.

### B. False Arrest

Defendants are on firmer ground with respect to Ms. Whitney's claim of false arrest. To defeat summary judgment on that claim, Ms. Whitney must present evidence from which a jury could find there was no probable cause for her arrest. *See Bianchi v. McQueen*, 818 F.3d 309, 322 (7th Cir. 2016) (citing *Wallace v. Kato*, 549 U.S. 384, 386–87 (2007)). An officer has probable cause to effect an arrest if, "at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). The severity of the alleged offense is irrelevant to the probable cause inquiry. *Ray v. City of Chicago*, 629 F.3d 660, 663 (7th Cir. 2011) ("Where a police officer 'has probable cause to believe that an individual has committed

---

parties have not briefed this issue, and the court finds that the facts are sufficient to defeat summary judgment without addressing it.

even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'") (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)).

Even construing all of the contested facts in Plaintiff's favor in this case, no reasonable jury would conclude that Officers Sabatini and O'Neill lacked probable cause to arrest her. The officers reasonably believed that Ms. Whitney was committing the offense of disorderly conduct, which broadly prohibits a person from acting in such an "unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILL. COMP. STAT. 5/26-1(a).[6] *See Biddle v. Martin*, 992 F.2d 673, 678 (7th Cir. 1993) (affirming the district court's finding that an officer had probable cause to arrest a drunken man for disorderly conduct in Illinois, when the man swore and yelled at an officer while walking up and down a sidewalk during a traffic stop); *In re Cody L.*, 2013 IL App (1st) 132305-U, ¶ 47, 2013 WL 6458944 (explaining that "[d]isorderly conduct is 'loosely defined' and 'a highly fact-specific inquiry'") (citing *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 30, 957 N.E. 2d 1241). Defendant officers in this case removed Ms. Whitney from the train after the conductor complained about her behavior, and the video shows Ms. Whitney gesticulating and pointing her finger at the officers on the platform. She agrees that "the video shows [her] upset and angry." (Whitney Dep. [129-2 Ex. F], at 88:7–8.) The undisputed facts show that an officer would reasonably believe Ms. Whitney had committed disorderly conduct. Thus, Defendants' motion for summary judgment on the false arrest claim is granted.

---

[6] Defendants also argue that the officers had probable cause to arrest Ms. Whitney for violating 720 ILL. COMP. STAT. 5/12-2(a)(6) (prohibiting the assault of a peace officer) and 720 ILL. COMP. STAT 5/31-1(a) (prohibiting the resistance or obstruction of an officer's performance of "any authorized act within his or her official capacity"). Because the court finds that the Officers had probable cause to arrest Ms. Whitney for disorderly conduct, it need not reach these grounds, but notes again that no evidence in the record supports an arrest for battery, 720 ILL. COMP. STAT. 5.01/12-3(a)(2). *Cf. Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (finding that there was a genuine issue of material fact, when the plaintiffs were arrested for battery and the parties disputed whether they ever touched any officers).

### C. Conspiracy

In Count II of her Complaint, Plaintiff Whitney argues that the Defendant officers conspired with Mr. Porche to violate Ms. Whitney's constitutional rights. To survive a motion for summary judgment, Plaintiff must provide some evidence that there was an agreement among Defendants. *See Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) ("[A] conspiracy claim cannot survive summary judgment if the allegations are vague, conclusionary and include no overt acts reasonably related to the promotion of the alleged conspiracy."); *Walker v. Thompson*, 288 F.3d 1005, 1008 (7th Cir. 2002) (explaining that if it becomes "apparent in the course of the litigation that there was no overt act, the plaintiff's suit would have to be dismissed"). Even with inferences drawn in her favor, Ms. Whitney has not established agreement among the Defendants. Ms. Whitney testified at her deposition that she "believed" that Mr. Porche had "communicated" with the Defendant Officers "because he had a cell phone in his hand and it looked like maybe he was texting." (Whitney Dep. [129-2 Ex. F], at 62:8–18.) She admits, however, that she "didn't see his phone" so she "didn't know exactly what [Mr. Porche] was doing." (*Id.* at 62:20–21.) These conclusory statements are nothing more than a "scintilla of evidence," *Liu*, 191 F. 3d at 796, and no other evidence suggests any agreement among the Defendants— certainly no agreement to violate her right not to be subject to excessive force. Defendants' motion for summary judgment on the conspiracy claim is granted.

### D. Failure to Prevent a Civil Rights Violation

Plaintiff Whitney argues that both officers "had the opportunity and duty to prevent the violation of the Plaintiff's civil rights by the other Defendant Officer, but failed to do so." (Compl. [20], at Count III ¶ 34.[7]) An officer can only be liable for failure to prevent a constitutional violation under § 1983 if the officer had reason to know that another officer was violating the Constitution and had a reasonable opportunity to prevent the violation. *Sanchez v. City of Chicago*, 700 F.3d

---

[7] The Plaintiff's complaint includes multiple paragraphs numbered 33 through 36, and the complaint lacks page numbers. Therefore, the court specifies the count to which it refers for clarity.

919, 927 (7th Cir. 2012). *See also Timas v. Klaser*, 23 Fed. Appx. 574, 579 (7th Cir. 2001) (noting

that the officer must have been "presented with a realistic opportunity to intervene to prevent other

law enforcement officers from infringing the constitutional rights of citizens"). "Whether an officer

had sufficient time to intervene or was capable of preventing the harm caused by the other officer

is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury

could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest,* 110 F.3d 467, 478 (7th

Cir. 1997), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

*and Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The evidence that Officer Sabatini had an opportunity to prevent Officer O'Neill's use of

excessive force is sufficient to survive summary judgment, if barely so: For a short window of

time, Officer O'Neill had his arms around Ms. Whitney's throat or shoulders, and Officer Sabatini

was not yet actively engaged in handcuffing Ms. Whitney. That arrest took several seconds, and

both officers were involved. (*See* Video [129-2 Ex. G].) No reasonable jury could find, however,

that Officer O'Neill could have prevented Officer Sabatini from using force against Ms. Whitney.

Officer Sabatini's unconstitutional use of force consisted, at most, of a deflection of Ms. Whitney's

pointed finger and an almost instantaneous subsequent open-handed blow to Ms. Whitney's

head. The speed of those events would have provided Officer O'Neill with no realistic opportunity

to intervene. *See Lanigan*, 110 F.3d at 478 (finding that an officer did not fail to intervene when

his fellow officer's conduct "consisted only of one poke and push and a contemporaneous

statement"). On the failure to intervene claim, Officer Sabatini's motion is denied, but Officer

O'Neill's motion for summary judgment is granted.

### E. Qualified Immunity

Having denied summary judgment on some of Ms. Whitney's claims, the court turns to

Defendant officers' qualified immunity defense. "Qualified immunity attaches when an official's

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *County of Escondido v. Emmons*, 586 U.S. ___, 2019 WL 113027,

at *2 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted)). In analyzing qualified immunity, the court must assess "(1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018). A constitutional right is clearly established when "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates the law." *Abbott v. Sangamon County,* 705 F.3d 706, 725 (citation omitted).

As discussed above, the facts of this case would permit a reasonable jury to find that both Defendant officers used excessive force in violation of the Fourth Amendment, and that Defendant Sabatini failed to prevent Officer O'Neill from using excessive force. That the use of excessive force and the failure to intervene violates the Fourth Amendment is well-recognized, and the requirement that a constitutional right be clearly established "does not require [plaintiff to identify] a case directly on point." *See White v. Pauly*, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (internal quotation marks and citations omitted). But in two recent per curiam opinions, the Supreme Court has clarified that in excessive force Fourth Amendment cases, officers "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *County of Escondido v. Emmons*, 2019 WL 113027 *2 (quoting *Kisela*, 138 S. Ct. at 1153 (2018) (emphasis omitted and internal quotation marks removed)). *See also Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018) (explaining that "the precedent must be 'particularized to the facts of the case'") (quoting *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017). Alternately, a plaintiff may "overcome an officer's qualified immunity by showing that the conduct in question is 'so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully.'" *Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018) (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013)).

At this stage, neither party has briefed the question of whether precedent is sufficient to defeat a qualified immunity claim, and the court is not prepared to conclude that the conduct of Officers Sabatini and O'Neill was "so egregious and unreasonable" as to eliminate any doubt on the question. The court will therefore reserve ruling pending additional brief on the questions of (1) whether established law permitted Officer Sabatini to strike Ms. Whitney, under the facts construed in Ms. Whitney's favor; and (2) whether the established law permitted Officer O'Neill to place Ms. Whitney in a choke hold, under the facts construed in Ms. Whitney's favor.

## II.    State Law Claims

Because the court retains jurisdiction over a small number of Plaintiff's constitutional claims, it also exercises continued jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367. Plaintiff Whitney lodges three Illinois common law claims: malicious prosecution,[8] intentional infliction of emotional distress, and battery. The Defendants counter that the Tort Immunity Act, 745 ILL. COMP. STAT. 10/2-101 ("TIA") bars liability for each of these claims, and that, in the alternative, each claim fails for other reasons.

### A.    Malicious Prosecution

Ms. Whitney alleges that "the Defendant Officers" filed a battery complaint against her in order "to harass" her. (Compl. [20], at Count V ¶ 33.) She also accuses the Defendants of giving "false statements against Plaintiff to the prosecutor." (*Id.* at ¶ 34.)

"The elements of a malicious-prosecution claim under Illinois law are well established. The elements are (1) the commencement of judicial proceedings by the defendant, (2) a lack of probable cause for the proceedings, (3) malice in instituting the proceedings, (4) termination of the prosecution in the plaintiff's favor, and (5) damage or injury to the plaintiff." *St. Paul Fire & Marine Ins. Co. v. City of Zion*, 2014 IL App (2d) 131312, ¶ 15, 18 N.E. 3d 193, 197 (citations omitted). "All of these elements must be established; the failure to establish even one element

_____

[8]    To the extent Ms. Whitney's complaint can be construed to state a malicious prosecution claim against Mr. Porche (*see* Compl. [20], at Count V ¶ 33 et seq.), the court notes that Mr. Porche is no longer a defendant in this case.

will preclude recovery for malicious prosecution." *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 641, 784 N.E. 2d 258, 265 (2002).

Ms. Whitney has provided sufficient evidence of these elements to defeat Officer Sabatini's motion for summary judgment. Officer Sabatini filed a misdemeanor complaint against Ms. Whitney for battery on September 5, 2013. (Misdemeanor Compl. of Laurie Sabatini [129-2 Ex. H].) *Cf. Beaman v. Freesmeyer*, 2017 IL App (4th) 160527, ¶ 50, 82 N.E .3d 241, 250, *appeal denied*, 93 N.E.3d 1055 (Ill. 2017) (affirming the trial court's grant of summary judgment in favor of defendants on a malicious prosecution charge, when those defendants "did not sign the criminal complaint or initiate the criminal proceedings against" the plaintiff).

Evidence of probable cause for such a charge is also lacking—no video evidence, none of Defendants' affidavits, and none of Ms. Whitney's deposition testimony supports the claim that Ms. Whitney "struck Officer Sabatini in the neck and chin area with her open hand." (Misdemeanor Compl. of Laurie Sabatini [129-2 Ex. H].) Malice may be inferred from Officer Sabatini's complaint, given this absence of evidence that Ms. Whitney committed a battery. *Fabiano*, 336 Ill. App. at 647, 784 N.E.2d at 270 ("[T]he trier of fact may infer malice from lack of probable cause if there is no credible evidence which refutes that inference."). Though the evidence is somewhat uncertain, it appears that the proceedings terminated in Ms. Whitney's favor: she testified at her deposition that she "believe[s]" her criminal case was dismissed (Whitney Dep. [129-2 Ex. F], at 146:2), and her Response to Defendants' Statement of Facts states that "[a]ll charges against [P]laintiff was [sic] dismissed due to non-factual evidence." ([137], at ¶ 37.) In their Amended Answer to the Complaint, Defendants denied the allegation that the prosecution "was resolved in the Plaintiff's behalf in a matter [sic] indicative of her innocence." ([58], at Count V ¶ 35.) Neither side has offered any other evidence concerning the disposition of the criminal charges against Ms. Whitney. Finally, Ms. Whitney claims that her prosecution caused her physical and mental injuries. (Compl. [20], at Count V ¶ 36. *See also,*

*for example*, Whitney Dep. [129-2 Ex. F], at 119:12–23 (attesting to suffering from PTSD as a result of the incident).)

On these facts, the court finds that there is a genuine dispute of material fact on the malicious prosecution claim sufficient to defeat Defendant Sabatini's motion for summary judgment. Metra's motion is also denied.[9]  Officer O'Neill's motion is granted, as no facts suggest that he played any part in Ms. Whitney's prosecution for battery. The court presumes that the disposition of the charges is a matter of public record, and directs the parties to present relevant documentation or stipulate regarding the outcome of the state court charges.

### B.      Intentional Infliction of Emotional Distress

The legal requirements for an allegation of an intentional infliction of emotional distress (IIED) are exacting in Illinois: "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 269, 798 N.E. 2d 75, 80, 278 Ill. Dec. 228 (2003).

Ms. Whitney cannot meet the first of these elements. To be truly extreme and outrageous, "the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.* at 270. "Not every battery will satisfy the extreme and outrageous requirement for an intentional infliction of emotional distress claim." *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1123 (N.D. Ill. 1997) (citing *Whitehead v. AM Int'l, Inc.*, 860 F. Supp. 1280, 1290 (N.D. Ill.1994)). This court has explained that "[t]o qualify as extreme and outrageous, the force used must be very extreme or cause very severe physical injury." *DuFour-Dowell*, 969 F. Supp. at 1123 (citations omitted).

---

[9]      Metra's sole argument against *respondeat superior* liability is that "the claims against the individual officers fail." (Dfs.' Metra & Officers Sabatini & O'Neill's Amended Memorandum in Support of Their Amended Joint Motion for Summary Judgment [129-1], at 14.) Any other arguments against *respondeat superior* are waived.

Drawing inferences in favor of the non-moving party, the evidence shows that in a relatively brief single episode, Defendant officers struck Ms. Whitney and used a choke hold to effect an arrest. Leading up to that arrest, Ms. Whitney was admittedly upset, and she, at least, flailed her arm at Officer Sabatini after the Officer swatted Ms. Whitney's hand away. This use of force, though potentially excessive, is not beyond all possible bounds of decency. Nor are Ms. Whitney's injuries so severe as to raise a genuine dispute of material fact. Defendants' motion for summary judgment on the IIED claim is granted.

### C. Battery

In Illinois, "battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.'" *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (quoting *Cohen v. Smith*, 269 Ill. App .3d 1087, 207 Ill. Dec. 873, 648 N.E. 2d 329, 332 (1995)). *See also* 720 ILL. COMP. STAT. 5/12-3. The facts noted in the court's discussion of excessive force could permit a reasonable jury to find in favor of Ms. Whitney on her battery claim. Defendants' motions for summary judgment are denied.

### D. Tort Immunity Act

The Defendants finally argue that the Local Governmental and Governmental Employees Tort Immunity Act ("TIA") cloaks them with immunity. 745 ILL. COMP. STAT. 10/2-201 et seq. Section 202-2 of that act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *Id.* at 10/2-202. The statute defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.* at 10/1-210. "Whether an officer acted in such fashion 'is normally a question of fact to be determined by the jury.'" *Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (quoting *Stamat v. Merry*, 78 Ill. App. 3d 445, 33 Ill. Dec. 808, 397 N.E. 2d 141, 145 (1979)).

Again, the evidence is slim, but the court concludes that a reasonable jury could find the officers' use of force against Ms. Whitney was willful and wanton. *Cf. Smith v. City of Chicago*, No. 97 C 0763, 1999 WL 162811, at *5 (N.D. Ill. Mar. 9, 1999), *aff'd* 242 F.3d 737 (7th Cir. 2001) (denying a defendant officer's motion for summary judgment on excessive force, but granting him summary judgment on battery, where the Officer "pulled [the plaintiff] out of his vehicle, slammed him against his car, and pinned his arms against his back. . . . [The officer's] actions might be characterized as willful and wanton if it were not for the complete absence of any allegation that [the plaintiff] suffered physical injuries as a result of the alleged battery"). Similarly, a reasonable jury could find, on the facts in the record, that Officer Sabatini's filing of a misdemeanor complaint against Ms. Whitney for battery was willful and wanton. *Cf. Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 802, 861 N.E. 2d 313, 320 (2006) (affirming the circuit court's finding that the defendant officers were immune under the TIA, where the defendant officers "had probable cause to arrest plaintiff" and then filed a misdemeanor complaint against the plaintiff for the same violation that led to the arrest). Because the TIA does not preclude liability for Officers Sabatini and O'Neill, Metra remains potentially liable as well. *Cf.* 745 Ill. Comp. Stat. 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.").

## CONCLUSION

Defendants' motion for summary judgment [129] is granted in part and denied in part. There are genuine disputes of material fact regarding the amount of force used by the Defendant Officers in effecting Ms. Whitney's arrest, and regarding Officer Sabatini's duty to intervene in Officer O'Neill's alleged excessive use of force. Further, genuine disputes remain as to the Officers' battery of Ms. Whitney, and as to Officer Sabatini's malicious prosecution of Ms. Whitney. The parties are ordered to brief the qualified immunity question. Defendants' motion for summary judgment is granted on all other claims. The parties are encouraged to explore the possibility of settlement, as well.

ENTER:

Dated: January 16, 2019

_____
REBECCA R. PALLMEYER
United States District Judge